**CHURCHILL MEAT COMPANY,**
Plaintiff,

v.

**Michael BRODSKY, doing business as Clifton Hydraulic Press Company,**
Defendant.

Civ. A. No. 411–56.

United States District Court
D. New Jersey.

March 17, 1958.

Richards & Cifelli, Newark, N. J., by William J. Ruano, Pittsburgh, Pa., for plaintiff.

Joseph B. Stadtmauer, Passaic, N. J., for defendant. Bierman & Bierman, by

Harry C. Bierman and Jordan B. Bierman, New York City, of counsel.

WORTENDYKE, District Judge.

■ This case involves the validity and alleged infringement of United States Patent No. 2,565,245, issued on August 21, 1951 to Morris Lebovitz and assigned to plaintiff. It is described in the specification as a "Method And Means For Shaping Meats" and consists of two claims.[1]

The case was tried with a jury which, in response to specific questions put to it pursuant to Fed.Rules Civ.Proc. rule 49(a), 28 U.S.C.A., found the patent valid and infringed. At the close of all of the evidence defendant moved for a directed verdict in accordance with Rule 50 (b). This motion was denied, and by virtue of the reservation implicit in such denial, defendant has duly moved for judgment notwithstanding the verdict. The issue of damages was eliminated from the case by direction of the Court for failure of supporting proof. The motion *n. o. v.* was submitted on briefs and orally argued. This opinion embodies the Court's decision which was reserved at the conclusion of the argument.

### The Patent in Suit

The device covered by the patent (Lebo) is essentially a two-way hydraulic press by means of which a piece of frozen meat is conformed by the application of vertical and horizontal pressures into a cylindrical shape of maximum density. To achieve this conformation, the piece of meat is placed in a stationary, longitudinally-divided, horizontal half-cylinder, closed at one end. Thereupon the movable, complementary upper half of the cylinder is hydraulically pressed downward to confine the meat within the concavity of the cylinder thereby ultimately formed, and this vertical pressure is thereupon supplemented by horizontally applied hydraulic pressure against a plunger moving against the meat through the cylinder thus formed, and successively applied thereto by a reciprocating motion until the maximum compression into the desired conformation of the meat is achieved.

The advantages afforded by the method and results which the inventor claims for the patent over prior meat handling processes are stated in the second paragraph of column one of the patent specifications. The principle object sought to be achieved by the invention is stated in

---

1. "1. In a hydraulic press for shaping fresh meat into cylindrical form, in combination, a bottom semicylindrical stationary die, a top semicylindrical movable die, guide means for vertically guiding said top die so that it may be raised from or lowered into engagement with said bottom die, hydraulic means to reciprocate said top die, a pivotally mounted end cover for said bottom die, a latching lever pivotally mounted on said cover and adapted to clamp said cover to said bottom die, a plunger reciprocable within said dies and conforming to the shape thereof, a hydraulic cylinder exteriorly of said dies and including a piston in coaxial relationship to said plunger, and means controlled independently of said hydraulic means for introducing hydraulic fluid alternately against opposite faces of said piston in said hydraulic cylinder so as to effect reciprocation of the plunger contained within said dies and ramming of a piece of fresh meat contained within said dies while said end cover and top die are in the closed position, thereby shortening the length of the piece of meat as well as deforming it into the cylindrical shape of said dies.

"2. The method of treating and reshaping an irregular piece of solid fresh meat having voids therein so as to provide slices of uniform cross-sectional shape without appreciable voids, comprising bringing the meat to about 30° F., introducing it into a mold while at said temperature, applying high. pressure along one dimension of said meat while confined within said mold and simultaneously applying a series of successive ramming strokes along a transverse direction relative to said one dimension and of the order of tons of pressure so as to completely fill the voids adjacent the inner wall surfaces of said mold and those within the meat, thereby simultaneously reducing the length of the meat along said transverse direction in proportion to the total volume of said voids, and removing the shaped meat from the mold."

column two of the specifications to be that of providing "a novel method for shaping meat into cylindrical form or other desired shape, which method eliminates loss of blood as well as flavor and discoloration normally accompanying commonly used meat shaping operations, also which is speedier than presently known methods, and which provides a uniformly shaped solid piece of meat retaining all the blood content and flavor as well as the original appearance of fresh meat." Another claimed advantage is the achievement of a uniform cross-section of the meat so that upon slicing the pieces will be "uniformly sized discs."

In support of his contention that Lebo is invalid for lack of invention, defendant relies not only upon the referenced prior art patents, but also upon that of Marshall, No. 43,516, issued July 12, 1864, entitled "Improved Process For Preserving Meats", which involves a similar molding of meat by vertical and horizontal pressures manually applied, and which was not cited. Both parties to the present suit concede that the substitution of hydraulic pressure for manually applied screw pressure is old in the art.

### Claim 2.

■ The duty of this Court, confronted with the pending motion, has been expressed by Judge Hastie, speaking for the Third Circuit Court of Appeals in Packwood v. Briggs & Stratton Corp., 1952, 195 F.2d 971, 973, certiorari denied 344 U.S. 844, 73 S.Ct. 61, 97 L. Ed. 657, rehearing denied 344 U.S. 882, 73 S.Ct. 174, 97 L.Ed. 683. After stating that the jury's finding of invention and validity of the patent in suit was very grossly wrong, Judge Hastie says:

"A jury in a patent case is not free to treat invention as a concept broad enough to include whatever discovery or novelty may impress the jurors favorably. Over the years the courts of the United States, and particularly the Supreme Court, have found meaning implicit in the scheme and purpose of the patent laws which aids in the construction of their general language. In this process, rules and standards have been developed for use as guides to the systematic and orderly definition and application of such a conception as invention in accordance with what the courts understand to be the true meaning of the Constitution and the patent laws. Once such standards and rules are authoritatively announced any finding of 'invention' whether by a court or a jury must be consistent with them. * * * This authority and responsibility to keep jury findings within reasoned rules and standards is an essential function of United States judges today as it long has been of common law judges. * * * It stands as a great safeguard against gross mistake or caprice in fact finding."

Adherence to this judicial obligation was exemplified by Judge Willson in Nachtman v. Jones & Laughlin Steel Corp., D.C.W.D.Pa.1955, 134 F.Supp. 392, 395, affirmed 3 Cir., 1956, 235 F.2d 211. He reminds me that, while I am " 'not free to reweigh the evidence or set aside the verdict because the jury might have drawn different inferences or conclusions or the court might have thought another result more reasonable, but must take the view of the evidence most favorable to the plaintiff. * * *' Magee v. General Motors Corp., 3 Cir., 213 F.2d 899, 900", I must, nevertheless, review the evidence. In such a review, however, the sufficiency of the evidence must be appraised in the light of the general principles referred to in Packwood, supra.

Lebo is measured and limited by its claims, which are two in number. Claim 1 relates to the press or apparatus. Claim 2 relates to the process of treating and reshaping an irregular piece of solid fresh meat, which has been brought to about 30° F., by means of the apparatus described in Claim 1. In the language of Judge Smith of this Court, in Ludlow Manufacturing & Sales Co. v. Dolphin

Jute Mills, D.C.D.N.J.1943, 50 F.Supp. 395, 398, affirmed per curiam, 3 Cir., 145 F.2d 471, the so-called process claims of the Lebo patent does not:

"* * * [D]efine a patentable method but define(s) the peculiar and characteristic functions of the elements of the apparatus recommended for its practice, and appropriately illustrated and described in the specifications of the patent. * * * The successive operations of the purported method, as hereinabove stated, are inherent in the elements of the apparatus as the peculiar and characteristic functions thereof."

A reading of Claim 2 of Lebo indicates that the method referred to therein is nothing other than the functioning of the apparatus described in Claim 1 when applied to a piece of solid fresh meat previously brought to a temperature of approximately 30° F. Because, therefore, the method therein described was not patentable, Claim 2 of the Lebo patent is invalid as a matter of law, and the jury's finding of validity and infringement respecting this claim must be set aside and judgment must be entered for the defendant declaring that claim invalid. Therefore, this claim cannot be considered infringed directly or contributorily by the defendant or the accused device which it manufactured and sold to its vendee. Bergman v. Aluminum Lock Shingle Corp. of America, 9 Cir., 1957, 251 F.2d 801; Cridlebaugh v. Rudolph, 3 Cir., 1942, 131 F.2d 795, certiorari denied 318 U.S. 779, 63 S.Ct. 855, 87 L.Ed. 1147.

### Claim 1.

Morris Lebovitz, the inventor of the apparatus described in Claim 1, was engaged in the meat business, in the course of which he had occasion, from time to time, in processing fresh meat, to change its form from the irregularity in which it was received from the abattoir, to one which would permit its slicing into disc-like portions for sale as minute steaks and for similar purposes. Before the alleged invention it was necessary to thaw the meat before endeavoring to form it into shape suitable for the slicing mentioned, and in the course of such formation there were some losses of material. There was also a lack of uniformity in the density, size and weight of the slices cut from the meat after such conformation. The necessity for thawing before such conformation jeopardized the freshness of the meat and involved risk of evaporation or other loss of its juices. Accordingly, the inventor conceived the idea of cylindrically molding the meat while still frozen, and subjecting it, while in process of such molding, to horizontal and vertical pressures to achieve maximum density and uniformity of cross-section throughout the meat, without loss of blood or other juices contained therein. After spending some two years in collaboration with an engineer in his employ, Mr. Lebovitz evolved the hydraulic press described in Claim 1 of the patent in suit.

After securing the patent, the inventor or his assignee was successful in selling his machine to several of the better known and successful meat packing corporations, including Armour and Swift. His first machine was sold to Excelsior Quick Frosted Meat Products, Inc., of Long Island, New York, to which company, concededly, a similar machine was subsequently sold by the defendant. Mr. Lebovitz testified that in developing his invention he informed his engineer what he desired to accomplish therewith and his engineer thereupon constructed a machine to achieve such described results. In the process of developing the apparatus a press purchased from another source was used as a model to work upon, and his contrivance was put in final form just prior to November 12, 1949, the date upon which his original application for patent was filed. The witness conceded that he was not the first one to use or conceive of a meat press using hydraulic pressure, and described his contribution to the art of molding meats

as the substitution of his press for the hand molds which had preceded its creation.

From the testimony of the inventor's sales agent, his invention became steadily more profitable, and during the period 1954–55, his profit per machine, before deduction of commission, was $2,228.46. The product was generally accepted, nationally advertised and favorably commented upon in trade literature.

The foregoing is a very brief review of the substance of the evidence insofar as it was presented by the plaintiff upon the issue of validity. Diagrammatic and photographic portrayals of plaintiff's apparatus were exhibited in evidence, and the construction and method of functioning of the apparatus was described in detail.

The application in combination of pressures both horizontal and vertical is of equal antiquity. Marshall taught a wooden box which could be closed at one end, in which a piece of meat could be inserted and upon which a horizontal cover could be brought down under vertical pressure applied manually by a screw mechanism simultaneously with or preceding the application to the remaining open end of the box of horizontal pressure similarly applied by the manual operation of a ,wheel and screw which compressed the meat into minimum volume and maximum density within the box. Thereafter, the opening of the end of the box opposite to the application of the horizontal pressure, and the continued application of the latter, permitted the movement of the compressed and formed piece of meat into the container receptacle which was then hermetically sealed. The object of the method employed by Marshall with his apparatus was to eliminate from the meat as much fluid as possible so as to inhibit the commencement or progress of putrefaction therein. Compared with Lebo, the Marshall patent involved a machine for the simultaneous or successive application of pressures vertically and horizontally to compress a porous substance, such as meat, into a form or mold, reducing the voids in the compressed substance, and, therefore, the volume thereof, while correspondingly increasing the density of the substance and the uniformity of its cross-section.

Although Marshall uses a square or rectangular wooden box as his mold, the Lebo patent uses a cylinder formed by the approximation of two halves longitudinally divided. Marshall's meat was not frozen prior to compression, while that of the plaintiff is placed in the press at a temperature of about 30° F. The pressing of meat to preserve its texture, color, taste and wholesomeness, as well as to retain therein the blood and juices thereof, is neither new in the art nor so claimed to be by the plaintiff. It is a matter of common knowledge that a frozen piece of meat requires greater pressure for its compression than does a piece which is not frozen. It is also common knowledge that greater pressures can be achieved hydraulically than manually or mechanically. If Marshall is to be distinguished from Lebo because of the shape of the mold into which the meat is compressed, the employment of a cylindrical mold achieves no novelty. A boy who makes a snowball in his cupped hands is performing a function generally similar to that achieved by Marshall, as well as by the plaintiff's device. The softer the snow, the less the pressure required from the cupped hands of the child to increase its density and correspondingly reduce its volume in shaping the snowball.

As early as 1880 Hoefjen taught the use of a machine for packing boned ham. The means consisted of a metal cylinder divided into two halves longitudinally, closed at one end by a metal disc of a diameter equal to the joined two halves of the cylinder which were locked into place by a hooking arrangement, and having a plunger inserted in the closed cylinder that was moved by mechanical leverage operating a gear and ratchet in the direction of the closed end of the cylinder against the ham within it.

In 1934, Bech obtained a patent for a machine to produce square hams, apply-

ing by hydraulic means pressures in opposite directions horizontally against a piece of ham in a square container, upon which, by similar means, a vertical pressure was applied by bringing down and seating upon the container of the ham a top or cover. Within the limits of the thus ultimately confined internal space, the ham was compressed into conformity therewith.

Cotner, in 1941, secured a patent for a three-way hydraulic press system operating in one direction vertically and in two directions horizontally against the contents of a square box-like container serving as a mold for the substance placed within the same. In column one of the specifications of the Cotner patent we learn that:

> "In the operation of hydraulic press devices for shaping and forming bacon, meat, or other material, a plurality of the press rams or pressure devices are operated in sequence to compress the bacon, meat or other material into block or angularly-shaped forms.

> "Therefore, an object of my invention is the provision of a hydraulic press system which automatically causes the plurality of the press devices to be operated in sequence, in which the timing sequence is determined by the pressure encountered by the press device."

Plaintiff here, however, claims that its apparatus is capable of affording a ramming action of its horizontal plunger by a reciprocation of the plunger toward and from the meat. There is obviously no novelty in the reciprocation of a piston whether the alternation of force application employs steam, compressed air or hydraulic fluid, but the so-called "ramming effect" which the present plaintiff repeatedly emphasizes in this case seems implicit at least in the Cotner specifications if not actually in all of the prior art patents in evidence in this case.

In addition to the several prior art patents already mentioned, the defendant produced the testimony of Frederick Breitenfeld, Esq., who is a Patent Lawyer of 33 years' experience, a graduate of Stevens Institute of Technology and of Columbia Law School, and an instructor in mechanical engineering. This witness had familiarized himself with the Lebo patent, the construction and method of functioning of the apparatus described in Claim 1 thereof, and had also studied the entire Patent Office file in connection with the proceedings on the patent application. A photostatic copy of this file was marked as an exhibit in evidence. It was the opinion of this expert that the apparatus described in Claim 1 of Lebo was in all respects similar to the device disclosed by the Hoefjen Patent, except for the hinging of the upper half of the molding cylinder and the use of mechanical instead of hydraulic pressure. This witness pointed out that at least four patents other than that in suit employed hydraulic pressure for the purpose of compressing meat, and it was his opinion that the achievement of uniformity of density and cross-section of a piece of meat depended exclusively upon the amount of pressure employed in each of the critical directions. This analysis, coupled with the evidence previously discussed, leads me to the conclusion that Claim 1 is unpatentable.

While 35 U.S.C.A. § 101 renders patentable any new and useful improvement of a useful machine, an improvement of an apparatus, in order to be patentable, must be the result of invention and not the mere exercise of the skill of the calling or an advance plainly indicated by the prior art. If the alleged improvement merely uses the standards of a prior invention which shows some change in form and position but uses substantially the same device performing precisely the same offices with no change in principle, it is not a patentable improvement. Rock-Ola Mfg. Corp. v. Cusano, 3 Cir., 1953, 206 F. 2d 551. Further, a mere improving of a machine in the production of well-known results is not sufficient to make patentable a rearrangement or aggrega-

tion of old elements. Westinghouse Electric & Mfg. Co. v. Pittsburgh Transformer Co., D.C.D.Pa.1926, 10 F.2d 593. Plaintiff here, however, claims an original invention, not an improvement upon an earlier invention. As was the case in Nachtman v. Jones & Laughlin Steel Corp., supra, so it is here that even after taking all the evidence in its most favorable light for the plaintiff and resolving all disputed facts, questions and inferences in his favor, plaintiff's case remains wholly unproved. At best, the apparatus described in Claim 1 is "* * * a mere carrying forward of the original thought—a change only in form, proportions, or degree, doing the same thing in the same way, by substantially the same means, with better results * * *." Market Street Cable Railway Co. v. Rowley, 1895, 155 U.S. 621, 629, 15 S.Ct. 224, 228, 39 L.Ed. 284.

Judicial distaste for combination patents was first expressed in Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S. Ct. 662, 82 L.Ed. 1008, where an apparatus for lubricating bearings was held void as performing no new function in combination. A combination patent was next struck down in Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. Although based on the "flash of creative genius" test, nevertheless, the Court held that improvements in lighters used in automobiles were invalid as constituting mere exercise of the skill of the calling resulting in an advance plainly indicated by the prior art. In Jungersen v. Ostby & Barton Co., 1948, 335 U. S. 560, 567, 69 S.Ct. 269, 272, 93 L.Ed. 235, it was said that where " * * * invention is plainly lacking, commercial success cannot fill the void." Here, as there, invention is plainly lacking and there is no basis for tipping the scales of judgment toward patentability as was done in Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721. Finally, despite evident commercial success, a combination of old parts which produced no new or different function or operation was held invalid in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

Because no basis for tipping the scales of judgment toward patentability here exists, plaintiff's reliance upon Moist Cold Refrigerator Co. v. Lou Johnson Co., 9 Cir., 1957, 249 F.2d 246 is misplaced. See, Bergman v. Aluminum Lock Shingle Corp. of America, supra, and Proctor Electric Co. v. Sunbeam Corp., D.C.N.D.Ill.1954, 121 F.Supp. 411, 413, where the contention that a thermostat and "hot" wire, in combination, presented one integrated and patentable device was held to be correct " * * * only if the combination produced a new, unanticipated function."

I conclude that under all of the evidence in this case there was no room for reasonable men to differ. Therefore, the findings of the jury that the Lebo patent was valid and infringed was in disregard of the evidence and must be set aside. By reason of my determination that the patent in suit is invalid, the evidence was incapable of supporting the charge of infringement. Bergman v. Aluminum Lock Shingle Corp. of America, supra; Cridlebaugh v. Rudolph, supra.

Defendant's motion for judgment notwithstanding the verdict will be granted. An order may be presented in conformity with the views herein expressed.